On this appeal from a jury verdict and sentence following trial before Judge Nancy Margaret Russo, I respectfully dissent from the majority opinion on assignments of error one and two, and concur in part and dissent in part on assignment of error three. Moreover, even if Slagter's conviction could be upheld, I would vacate both the sentence and fine because the transcript of the sentencing hearing plainly revealed a failure to comply with statutory directives.
Whether Slagter had the mens rea necessary to establish possession of the mushrooms was the issue at trial. She claimed in her defense that she was unaware of the mushrooms' existence and had mistakenly believed the backpack contained some of her possessions. She testified that Kevin Wilson helped her move her things from her old apartment to the Wilson home the day before his death, and that she had as many as six backpacks containing her belongings in the home. She stated that some of the backpacks she used belonged to Wilson, that he had additional bags in the spare bedroom where she put her things and that, when told to get her belongings she brought six bags to the bottom of the stairs, expecting that she would be able to sort out the items that did not belong to her during the police officers' inspection.
Slagter's testimony was not wholly disputed by the police; although Officer Veto testified that Slagter brought two backpacks to the bottom of the stairs, Officer Pochervina testified that she gathered up several backpacks and that he thought it was strange for her to take so many after he had told her that she could only remove the items she absolutely needed.
The State used a number of strategies in its attempt to show Slagter's knowledge of the mushrooms, and thus her intentional possession of them. Lacking direct evidence of her mental state, it presented several types of circumstantial evidence to infer Slagter's knowledge of the mushrooms' presence. The State's case relied heavily on the fact that Slagter brought the backpack down the stairs and presented it for the officers' search, asserting such an act was evidence that she claimed ownership of the luggage and its contents. It diligently argued, both at trial and on appeal, that if Slagter did not knowingly possess the contraband, she ought to have immediately denounced ownership upon opening the bag containing the mushrooms and prior to her then immediate arrest.
The State also stressed the testimony of David Wilson, who testified that he knew his son abused drugs, but that he and his wife had made a rule that Kevin "absolutely" was not allowed to bring drugs into their home or he would be expelled immediately. He testified that his son "honored that commitment" and did not bring drugs into the Wilson home thereby supporting the State's assertion that the mushrooms were Slagter's. Finally, the State presented the testimony concerning cellular telephone records, and argued that those records completely discredited Slagter's version of events.
Slagter had testified that she awoke about 4:00 p.m. on October 10, 1998, believed that Kevin was asleep, got up and let her dog outside. She then called a friend, went to wake Kevin, discovered his condition, dragged him into the bathroom where she attempted to revive him, and then called 911 at 5:06 p.m. The evidence showed that Kevin owned two cell phones. Detective Ross Faranda testified about the contents of the records of both phones without objection. Although he was not present at the Wilson home until October 11, 1998, and, therefore, had no personal knowledge, Faranda also testified that both cell phones were in the Wilson home at the time of Kevin's death but admitted that neither phone was retrieved by police. The evidence did show that Slagter had a cell phone on her person at the Wilson home, she testified that it belonged to Kevin, and two officers testified that her phone rang many times while she was being interviewed after Kevin's death, but she did not answer it. The police allowed Slagter to give the phone to someone outside the home and neither it nor Kevin's other phone was ever recovered.
Despite the fact that the evidence showed that Slagter had only one of Kevin's cell phones, and did not identify which of the two she had, Faranda testified to the contents of both phone logs listing calls that were made from both phones between the estimated time of Kevin's death and 5:06 p.m., the time of the emergency 911 call. The phone records themselves were not made an exhibit. The State used this testimony to impeach Slagter's credibility and to argue that, instead of calling for help for the stricken Kevin Wilson, she was making drug deals or attempting to arrange for removal of the mushrooms from the Wilson home. This contention was prominent in the State's closing argument and rebuttal.
To buttress its contentions about Slagter's heartless disregard for Kevin's welfare by first attempting to remove the mushrooms and her subsequent and apparently irrational attempt to sneak them past an obvious police search, the State presented testimony and argument about their value. Although Officer Veto admitted that he had no personal knowledge or expertise in valuing the drugs, and that his information was based on unsupported hearsay of "specialized narcotic agents," he testified without objection or challenge that the 1585 grams (3 
1/2 pounds) of mushrooms were valued at $85,000. The State then argued vociferously that $85,000 was a compelling motivation for Slagter's phone calls prior to calling 911, and her attempt to sneak the drugs out of the house.
Slagter's first assignment of error challenges the search of her belongings. The police officers testified at the suppression hearing and trial that, despite Kevin's death and the fact that numerous vials and containers of various drugs were found in plain view in his bedroom, Slagter was not suspected of any criminal conduct. The officers testified that they considered the home a "crime scene," because of Kevin's apparent overdose, and only intended to secure the residence for the coroner's investigation. According to the officers, the search of Slagter's luggage was done to ensure that she did not remove anything but her personal belongings from the premises.
The judge determined that Slagter consented to the search by requesting to take her belongings with her. The majority opinion properly rejects this exception, finding Slagter's consent was coerced, but uphholds the police conduct, finding exigent circumstances justifying the warrantless search. This involves two findings: 1) that there was probable cause to suspect Slagter of criminal involvement in Kevin's drug overdose; and 2) that 20 year-old Amanda Slagter, five feet three inches tall, created the exigency by requesting to take her personal belongings out of the Wilson home.
Whatever arguments can be made to justify the warrantless search in this case, exigent circumstances is not among them. Once police secured the Wilson home, the danger of imminent loss or destruction of evidence was gone. When Slagter requested to take her belongings, the police were not obligated to grant the request and, if they believed a search was necessary, they could have refused her request and sought a warrant. There was no danger that she would overpower the police and take her belongings, and no reason to believe that the bags contained perishable or imminently dangerous substances requiring immediate discovery. Because the police had secured the premises and there was no danger that evidence would be lost, there were no exigent circumstances. See, e.g., State v. Bowe (1988),52 Ohio App.3d 112, 114, 557 N.E.2d 139, 142 (no exigency where police had secured all exits, thereby preventing suspect's escape).
Although the majority opinion goes astray in its analysis, it is still necessary to determine whether some other exception to the warrant requirement can justify the search here. The police officers believed that they were securing the residence for the coroner, suggesting that the search was akin to an inventory to ensure that Slagter removed only her own belongings from the potential crime scene. This justification also is defective. First, the coroner has no special authority to conduct searches of a residence. The coroner has authority over a decedent's body and personal effects found on the body, such as clothes and jewelry. The coroner might also be entitled to take possession of items found in plain view if they are suspected of relating to the death, just as police may take possession of incriminating items found in plain view. However, the coroner would have no greater authority than that of the government generally in searching a decedent's house without probable cause and a warrant. See, generally, R.C. Chapter 313. There must first be a suspicion of criminal conduct amounting to probable cause, and then some circumstances justifying an exception to the warrant requirement. Furthermore, I know of no rule allowing the coroner or any other government official to "inventory" a house's possessions after death in the absence of probable cause and a warrant. Just as there is no general "crime scene" exception to the warrant requirement, there is no "death scene" exception.
I agree that police are allowed to secure a potential crime scene to preserve evidence until deciding to seek and obtain a warrant. While the delay must be reasonable, I also believe that police can preserve the scene until the coroner makes an initial investigation of the body and the scene, as the coroner might provide special insight into whether a crime is suspected. However, at some point the police must seek a warrant or release their hold on the premises. No warrant was sought or obtained prior to the search in this case, and no circumstances justified any exception to the warrant requirement. Therefore the search was unreasonable.
Although unreasonable, I believe it is also necessary to decide whether the inevitable discovery doctrine might have precluded application of the exclusionary rule in this case. The argument, which has not been advanced by the State, the judge, nor the majority,[1]
would focus on whether the police eventually would have searched the bags in Wilson's home and discovered the mushrooms. For several reasons, I find the inevitable discovery doctrine would not apply.
The inevitable discovery doctrine is applied only in limited circumstances where the State can show that, despite the constitutional violation, discovery of the evidence was, in fact, inevitable — meaning that the State must prove not simply that the government could have found the evidence without the constitutional violation, but affirmatively would have found it. Statev. Perkins (1985), 18 Ohio St.3d 193, 480 N.E.2d 763, syllabus; State v. Miller (1991), 77 Ohio App.3d 305,315-16, 602 N.E.2d 296, 303; see, also, United Statesv. Jones (C.A.7, 1995), 72 F.3d 1324, 1334 (proof of inevitable discovery requires evidence, not simply argument; doctrine cannot be founded on mere speculation). Furthermore, courts have been loath to apply the inevitable discovery doctrine when police fail to seek a warrant, finding that the doctrine must not condone such behavior by allowing warrantless evidence on the ground that police would have sought a warrant, or even that they were in the process of obtaining a warrant. United States v. Buchanan (C.A.6, 1990),904 F.2d 349, 357. Because the inevitable discovery doctrine is applied only when the exclusionary rule would serve no effective deterrent purpose, the doctrine should not apply to allow an end-run to the warrant requirement. Such an exception would eviscerate the warrant requirement if allowed; police would not need to obtain a warrant if they could justify their search by stating that they intended to get a warrant later. United Statesv. Griffin (C.A.6, 1974), 502 F.2d 959, 961.
Police testified that Slagter was not suspected of any crime when they interviewed her at the death scene and a coroner's investigation at the home was unlikely to cast any further suspicion on her. The police were aware of the drugs in plain view, and suspected that Kevin died of a drug overdose, yet did not suspect Slagter of any criminal conduct. Even if they had probable cause to suspect Slagter of a crime, there is no indication that the police would have sought a warrant or consent to search the Wilson home or Slagter's bags. In fact, the tenor of the officers' testimony indicates that no further search would have been sought or conducted. Therefore the State could not have proved that the mushrooms would have been discovered. Moreover, even if the State had argued that a search would have been conducted, the failure to seek and obtain a warrant would have precluded application of the inevitable discovery doctrine. Buchanan, supra.
Finally, even if the inevitable discovery doctrine could be used and the drugs found admissible, evidence of the circumstances of the search and discovery of the drugs still could be excluded as a matter of law. The inevitable discovery doctrine is intended to apply only to prevent the defendant from gaining an unfair windfall. The exclusionary rule should be employed only as far as necessary to prevent the prosecution from being put in a better position by virtue of the unconstitutional conduct; the prosecution should not be put in a worse position because of some illegality that can be separated from discovery of the evidence.Williams v. Nix (1984), 467 U.S. 431, 443,104 S.Ct. 2501, 2508, 81 L.Ed.2d 377, 387; Miller,77 Ohio App.3d at 316, 602 N.E.2d at 303. Evidence of the circumstances of the search and discovery was presented to Slagter's great prejudice at trial, because the State asked the jury to infer that Slagter knew the contents of the backpacks on that basis. Those circumstances would not have occurred absent the illegal search. A legal search of the premises pursuant to a warrant would have occurred outside Slagter's presence, and discovery of the mushrooms would not have been accompanied by many of the circumstances the State considered so incriminating to Slagter.
For example, the State's argument relied heavily on the facts that Slagter brought the backpack down the stairs, presented it for the officers' search, and failed to immediately deny ownership of the mushrooms. Neither fact would have been admissible if the search was properly found to be illegal, even if the mushrooms themselves were found admissible under the inevitable discovery doctrine. The testimony also showed that Slagter was arrested immediately upon discovery of the mushrooms, and that she denied ownership shortly thereafter. I note this only because the State relied so heavily on her failure to promptly deny ownership, when such evidence is inadmissible. Even though no objection was made and no error assigned on appeal, I find it telling that the State's most compelling evidence has such tenuous probative value. The evidence indicates that the discovery of the mushrooms, Slagter's failure to deny ownership prior to arrest, the arrest, and the post-arrest denial of ownership all occurred within minutes. It is ridiculous to contend that her failure to voice a denial within this short period of time can have any more than slight probative value on the issue of her possession in this case.
Although in appropriate cases pre-arrest silence can be introduced as evidence and commented on by the prosecution, such use must be closely monitored to protect against the danger of unfair prejudice. Pre-arrest silence has been found substantially probative only where a defendant has been silent for a significant amount of time prior to the arrest, and the period of silence thus appeared inconsistent with a later claim of innocence or alibi. State v. Sabbah
(1982), 13 Ohio App.3d 124, 135-36, 468 N.E.2d 718,730-31. In Sabbah, the court noted that a forty-five minute period of pre-arrest silence was not sufficiently probative to outweigh the danger of unfair prejudice:
 The temporal proximity of appellant's arrest and the act precipitating it were simply too close to make his "silence" sufficiently probative of an inconsistency with his in-court testimony to warrant cross-examination thereon. Moreover, the prejudicial aspects inherent in the use of appellant's pre-arrest conduct as silence are indeed plain. The same dangers of prejudicial jury misuse identified with post- Miranda warning silence exist with equal force in the context of pre-arrest silence. The potential for prejudice was merely exacerbated in view of the negligible amount of time that elapsed between the shooting and appellant's arrestId.
The Sabbah court found the forty-five minute pre-arrest period negligible and noted that the short period of time increased the potential for unfair prejudice, as probative value decreases as the period of silence grows shorter. In this case the evidence showed that Slagter's pre-arrest silence probably lasted only seconds, and the probative value of that silence falls somewhere between negligible and nil. Again, even though no error was assigned to this evidence and argument, I note the issue because it indicates the relative strength of the State's case and the resulting prejudice to Slagter.
Slagter's second assignment of error concerns the exclusion of James Fambro's testimony. The judge ruled that Fambro's testimony was unfairly prejudicial to the State, and excluded the evidence pursuant to Evid.R. 403(A) and the majority finds that her ruling was not an abuse of discretion because "[t]he key issue was possession, not ownership." The majority blindly ignores the fact that the State presented testimony from David Wilson on the very same issues and has not identified the unfairly prejudicial effect Fambro's testimony would have had in comparison with David Wilson's.
The defense attempted to present, through Fambro, that Kevin Wilson owned the backpack containing the mushrooms, the mushrooms themselves, and two cellular phones. The defense argued that the State had opened the door to Fambro's testimony by introducing David Wilson's testimony implying that Kevin would never bring drugs into his parents' home, and essentially stating that Kevin could not have brought the mushrooms into the home. The State argued, and the judge agreed, that Fambro's testimony was irrelevant because the issue was possession, rather than ownership, of the drugs and the majority today adopts the same reasoning, without explaining: 1) why evidence of ownership is not probative on the question of possession; and 2) why David Wilson's testimony did not open the door to Fambro's testimony.
There is no doubt that evidence of ownership is probative of possession. Furthermore, as Slagter claimed to lack knowledge of the backpack's contents, establishing someone else's ownership of the mushrooms was a critical step in her defense. Her physical possession was beyond dispute; she could not deny the crime of possession without denying knowledge of the backpack's contents, and she could not deny knowledge without first denying ownership. I am thus baffled by the facility with which the majority concludes that the issue was possession, not ownership, without first addressing the probative value of the evidence offered and identifying some comparable prejudicial effect.
Fambro's proposed testimony had considerable probative value for it tended to prove Slagter's lack of knowledge of the backpack's contents by showing that someone else had ownership and control of the backpack. Therefore the danger of unfair prejudice or confusion of the issues must be both glaring and grave to "substantially outweigh" evidence so important and critical to Slagter's defense. I fail to see how this court can review the judge's decision under Evid.R. 403(A) without at least identifying the competing interests.
The State argued that Kevin Wilson was not on trial, was not available to defend himself and, therefore, evidence that he owned the mushrooms would be unfairly prejudicial. It also argued that evidence of ownership would "confuse the issues" because, as noted supra, the real issue was possession, not ownership. Why is it that neither the State, the judge, nor the majority opinion has explained how presenting evidence that a known drug user owned drugs is unfairly prejudicial, or explained how Slagter was expected to mount her defense without presenting evidence that someone else owned the drugs? The danger of "confusing the issues" here seems far less than the reality of denying Slagter the ability to present evidence in her defense. As in all such cases, the jury was given a standard instruction that defined "possession" in detail, including an explanation that one need not own a thing in order to possess it and, therefore, the danger of confusion was limited. By contrast, Slagter's defense was that she did notknowingly possess the mushrooms and she could not support this defense without presenting evidence that someone else owned them. By excluding the evidence of Kevin Wilson's ownership, the judge gutted Slagter's defense to falsely protect the memory of Kevin Wilson and prevent a nonexistent "confusion of the issues."
Moreover, no one has yet explained how Fambro's evidence was unfairly prejudicial or confusing when offered after David Wilson's testimony on the same issues. The State had no qualms about "confusing the issues" when it offered David Wilson's testimony that Kevin could not have owned the drugs because of the "house rule" that he not bring drugs into the house.[2]
Just as the State attempted to show the drugs did not belong to Kevin in order to prove that they belonged to Slagter, she was denied the opportunity to show that the drugs did belong to Kevin in making out her defense of lack of knowledge.
Having presented David Wilson's testimony, I would hold that the State had no right to object on the grounds of unfair prejudice when the defense tried to offer contrary testimony. I would also hold that once the State introduced David Wilson's testimony, it lost the right to object to Slagter's introduction of Fambro's curative testimony. See State v. Towns (1973),35 Ohio App.2d 237, 245-46, 301 N.E.2d 700, 706-07
(results of lie detector test admissible where necessary to remove prejudice arising from opposing party's introduction of evidence concerning test); 1 McCormick, Evidence (5 Ed.Strong Ed. 1999) 252, Section 57; 1 Wigmore, Evidence (Tillers Rev. 1983) 731, Section 15.[3]
Therefore, even if the evidence of ownership was irrelevant to the issue of possession, Fambro's testimony was admissible because the State presented testimony on the same issue.
Furthermore, although the majority does not rely on it, I would also reject the State's argument that Fambro lacked personal knowledge of the then current ownership of the drugs; Fambro had at least as much personal knowledge of Kevin's activities as David Wilson did. David Wilson's testimony was not based on personal knowledge, and was objectionable either because it was inappropriate character evidence or a weak attempt to establish Kevin's habit of not bringing drugs into his parents' home when it is beyond dispute that Kevin did so. Fambro's testimony could not have been any more unfairly prejudicial than David Wilson's.
In her third assignment of error, Slagter claims that her trial lawyer was ineffective on the basis that he did not request discovery from the State and, therefore, did not obtain or investigate the cell phone records about which Officer Faranda testified. According to Slagter, a review of the phone records would have shown that Faranda's testimony was inaccurate and misleading because he testified about calls that were not made, and stated that records documented incoming calls that were in fact outgoing. She asserts that a pretrial investigation of the records would conclusively prove that the most damaging calls were not made by the cell phone she had but from one that was completely outside the house and even its home area because those calls were assessed "roaming charges".
While I agree with the majority that this court cannot rule on Slagter's ineffective assistance of counsel claim because the phone records are not properly before us, I cannot agree with the majority's conclusion that Slagter's trial lawyer did not present the records or cross-examine Officer Faranda concerning them based on some acceptable trial strategy. How can such a statement be made without review of the records? Without reference to the phone records themselves, one cannot possibly assess the competence of a lawyer's decision not to present the records or cross-examine a witness on alleged inaccuracies. While disclaiming reference to the records, the majority finds that:
 It is therefore clear that defendant's trial counsel avoided reference to the phone records in order to divert attention from the fact that calls were also made on the phone in defendant's possession in the hours before the police were called, because this was contrary to defendant's testimony.
First of all, the majority's choice of words belies the fact that they have, in fact, reviewed the phone records that prove at least one of Kevin Wilson's cell phones was not in the house, and have agreed that calls made to or from that phone could not have involved Slagter or it would be unnecessary to distinguish the phone in defendant's possession from the phone Slagter alleges could not have been in her possession. Secondly, there is no evidence to show that the phone records were inconsistent with Slagter's testimony; she testified that she made at least one phone call before realizing that Kevin Wilson was dead, and she has alleged that Officer Faranda's testimony concerning the phone records was inaccurate. Without review of the records it is impossible to tell whether their data are inconsistent with Slagter's testimony and, therefore, impossible to divine whether her lawyer made a competent tactical choice.
Furthermore, regardless of whether one of the cell phone logs showed some inconsistency with Slagter's testimony, the transcript reveals that Faranda's testimony was used to Slagter's great prejudice; the State argued that she lied about the events of the day, that she knew Kevin Wilson was in dire straits long before seeking aid and delayed calling for help in order to get the mushrooms out of the house before the police or anyone else came. One cannot so easily defend the failure to challenge such damning allegations by invoking the mantra of "trial tactics." While Slagter was officially considered blameless in Kevin Wilson's death, it is clear that her trial for drug possession was inextricably and inappropriately tied to the fact of Kevin's death.
The majority also fails to note Slagter's lawyer's failed attempt to call James Fambro to testify concerning the cell phones perhaps because it undermines their conclusion that he was deliberately pursuing a tactic of diverting attention from the cell phones, and shows that he was unprepared to respond to the State's presentation on this subject. The majority opinion attempts to further defend Slagter's trial lawyer, while simultaneously admitting that no decision can be made without reference to the records, by stating:
 Moreover, the entire trial strategy was that defendant had recently met the decedent and was unfamiliar with his property, thus making confusion of the backpacks more plausible. It is now completely contrary to that strategy to assert that trial counsel should have presented this detailed information concerning Wilson's property.
With all due respect, I find this a non sequitur of dizzying proportion. For clarity's sake, my understanding is that "detailed information concerning Wilson's property" in fact refers to Slagter's claim that her lawyer failed to obtain, review, and investigate the records of Kevin Wilson's cell phones. I cannot by any stretch imagine how such investigation would threaten to expose Slagter's knowledge of Kevin Wilson's property in general, or her knowledge of the contents of his backpack specifically. The phone records would in large part speak for themselves, without any explanation from Slagter. While she might be able to identify particular calls to numbers she recognized, the extent of her knowledge cannot be ascertained on this record, nor would such recognition be "completely contrary" to her defense, because she testified about the use of one of Kevin's phone on the day of his death. The "detailed information" the majority refers to seems exactly the type of information a trial lawyer should learn in the course of investigating a case because a lawyer has a constitutional duty to do adequate investigation. Strickland v. Washington (1984), 466 U.S. 668, 691,104 S.Ct. 2052, 2066, 80 L.Ed.2d 674, 695. It is amazing that the majority would agree that Slagter's trial lawyer was justified in failing to investigate phone records subpoenaed and obtained by the State on the basis that his familiarity withthose records after investigation somehow could be attributed to Slagter.
As the majority has seen fit to prematurely defend Slagter's trial lawyer, they must tacitly approve of his failure to object to phone records or to the unsupported hearsay testimony that psilocybin mushrooms are valued at over $53 per gram, ($1,520 per ounce or over $24,000 per pound). While one can appreciate the difficulty a defense lawyer faces in deciding whether to challenge evidence of the value of drugs, because it might be seen as a tacit admission of at least some guilt, the testimony her was so outrageous, and employed for so damaging a purpose, that it could not be ignored.
The jury was encouraged to convict Slagter based on a contention that she ignored Kevin Wilson's plight while attempting to preserve her $85,000 investment. Although some inflation of actual value might be expected and police and prosecutors tend to measure all drugs at their highest retail value without regard to discounts based on quantity, evidence supporting only a $5,500 value of the mushrooms would have cooled the inference of Slagter's immoral conduct.[4]
Furthermore, evidence of the mushrooms' value was only marginally probative; the jury was encouraged to speculate that, because of the mushrooms' value, Slagter made unverified calls to unknown persons in an effort to get the mushrooms out of the home before she called for help. Even given the testimony that phone calls were made, there was no evidence concerning the persons called or the subjects of the conversations. The State's argument on this point was, if not completely improper speculation, only minimally probative of Slagter's knowing possession of the mushrooms. Therefore the outrageous value estimate added even more volatile fuel to the flames of speculation rampant in the State's argument.
As noted, the record shows that Slagter's lawyer sought to present James Fambro's testimony concerning the cell phones, but failed to discover or investigate the phone records subpoenaed by the State. While I have already addressed the majority's transparent justification concerning this failure, the State offered a different justification not relied on by the majority, claiming that Slagter's lawyer made a tactical decision not to request discovery in order to protect the identity of his witness, Fambro, from investigation and impeachment by the State. It is sheer speculation to suggest that Slagter's lawyer actually employed such a tactic rather than simply failing to conduct discovery, especially because the record indicates that Fambro's testimony might have been offered only in response to David Wilson's testimony for the State. If this was an actual tactic, it was unreasonable, because the record shows that the prosecution had in fact interviewed Fambro prior to trial. Slagter's lawyer could not reasonably seek to hide a witness of whom the State was already aware and it would be rather pointless to attempt to protect a witness from impeachment when the subject matter of his testimony required him to admit using drugs.
Finally, although I concur in the majority's recognition of plain error in Slagter's sentencing, I write separately to note that the error goes beyond that stated in the majority opinion. Slagter had not previously been convicted of an offense allowing or requiring incarceration. She was thus eligible for the presumption that the minimum sentence would apply to her conduct pursuant to R.C. 2929.14(B), rebuttable only if the judge "finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the defendant or others." The record of sentencing shows that the judge did not afford Slagter that presumption nor did she make any record finding that Slagter should not receive the minimum sentence.
Slagter received an eight-year prison sentence, while the minimum mandatory sentence was three years. I would require the trial judge to find not only that the presumption of a minimum sentence is undeserved on this record, but also that the presumption was so far rebutted that a five-year extension from the minimum prison term was justified. Even though R.C. 2929.14(B) requires only findings, and not a statement of reasons, the record must show that the sentencing judge made the findings after affording the presumption and considering the relevant facts in the record. State v. Edmonson (1999), 86 Ohio St.3d 324, 328,715 N.E.2d 131, 135. On review, the record must then support the trial judge's determination concerning both the defeat of the presumption and the length of the extended sentence. R.C. 2953.08.
Furthermore, the judge sentenced Slagter to a $15,000 fine when the mandatory minimum is only $10,000. The presentence report supported Slagter's claim of indigency immediately thereafter for purposes of appeal, but no affidavit or objection was raised at trial concerning the fine and there is no indication that the judge made any effort to assess Slagter's ability to pay a fine prior to imposing it. R.C.2929.18(B)(1), and (E), R.C. 2929.19(B)(6). I would thus also find that the fine was improperly imposed without assessing Slagter's ability to pay. Regardless of the reason for vacating the sentence, however, Slagter will now have the opportunity to submit an affidavit of indigency and request waiver of any fines. R.C. 2929.18(B)(1).
I would reverse Slagter's conviction based on assignments of error one and two, and hold that assignment of error three presents a noncognizable issue.
[1] This argument is presented in an effort to determine whether any justification can be made for the search or introduction of evidence in this case.
[2] Childlike belief in light of the vials and drugs found on Kevin's bedroom dresser.
[3] Although McCormick opines that a party should not be allowed to cure unless he has objected while Wigmore suggests that only a party who has not objected should be allowed to present curative evidence, both agree that a prior objection is irrelevant if the curing party is responding to sufficiently harmful or prejudicial testimony. Slagter's offer of Fambro satisfies this test, as David Wilson's testimony implied that she owned the mushrooms.
[4] High Times magazine, a publication devoted to celebrating the use of marijuana and other hallucinogens, reported that as of September 13, 1998, prices for psilocybin mushrooms in the Cleveland Area was $100 per ounce. While this market quotation is not evidence here, if introduced at trial this evidence would at least be arguably admissible under Evid.R. 803(17) while the State's hearsay evidence in this case was not even arguably admissible.